# Exhibit A

UNITED STATES BANKRUPTCY COURT
IN THE WESTERN DISTRICT OF MICHIGAN

IN THE MATTER OF:

SUPERIOR ENVIRONMENTAL CORP,

Debtor.
_____/

Chapter 11, Subchapter V
Case No.: 22-00353
Hon. Scott W. Dales
Filed: February 25, 2022

## SWORN STATEMENT OF JEFFERY SKENDROVIC, CHIEF OPERATING OFFICER OF DEBTOR, IN SUPPORT OF ITS FIRST DAY MOTIONS

I, Jeffery Skendrovic, being duly sworn, deposes that, to the best of my knowledge and belief:

### BACKGROUND

1. I am Debtor's Chief Operating Officer ("COO") and have been employed by Superior Environmental Corp. ("Superior") for thirty-two (32) years. As the COO, I have personal knowledge of the matters contained in this Declaration.

2. Superior was incorporated in 1989. Its original shareholder sold the company to James and Vaughn Quince (jointly "Quinces") in the early 1990's.

3. In the early 2000's, the Superior Environmental Corp Employee Stock Option Plan (the "ESOP") was formed. Initially, the ESOP owned 10% of Superior's shares.

4. Superior is an environmental services company that provides consulting, investigation, monitoring, and remediation services.

5. Superior's headquarters are located at 50 64th Ave S., Suite C, Coopersville, Michigan 49404. Superior currently operates additional offices in Connecticut and Illinois.

6. In 2017, the Quinces marketed Superior for sale. After receiving competitive offers, the Quinces agreed to sell their remaining shares in Superior to the ESOP for an amount similar to the offers it received from other parties.

7. As Debtor's Chief Operating Office (the "COO"), my responsibilities include managing Debtor's day-to-day operations. As COO I am familiar with the nature and extent of Debtor's financial condition, including its assets, liabilities, and transactional history.

## EVENTS LEADING TO CHAPTER 11 FILING

8. From 1989 through 2018, Debtor consistently operated at a profit; however, from 2019 through the present, Debtor operated at a loss.

9. Debtor's revenue consistently decreased from 2016 through 2021. In 2016, Debtor generated gross revenue of approximately $7.5 million. By 2021, Debtor's gross revenue fell to approximately $2.4 million.

10. Superior's financial decline was directly related to the loss of key personnel; the entry of a substantial judgment against Superior; and losses related to the COVID-19 pandemic. Specifically, the following factors contributed to Superior's financial decline:

   a. In 2017, the employees of Debtor's Bay City office all resigned and went to work for a competitor. Due to the specialized nature of Debtor's industry, replacing employees is difficult. Accordingly, the loss of the Bay City office employees resulted in a significant reduction in Debtor's revenue.

   b. In 2018 Debtor was sued by C.A. Murphy Oil ("Murphy") for alleged damages related to environmental consulting contracts from the mid-1990's. Defending Murphy's allegations resulted in significant additional monetary and non-monetary costs, including attorney's fees; time spent on

        litigation that could have been allocated to generating revenue; and loss of employee morale.

    c.    In 2020, with the renewed emphasis on the environment during the 2020 election cycle, Superior began developing a strategic plan to rebuild. However, its efforts to rebuild were hampered by issues related to the COVID-19 pandemic, including increased costs from inflation; reduced labor pools; and limitations on "essential" jobs during Michigan's "Shelter in Place" response to the COVID -19 pandemic. Specifically, Superior was only considered an "essential service provider" to the extent that Superior's client was considered essential. For instance, Superior was able to continue working on projects for utility companies but was unable to perform profitable real estate consulting services such as Phase I reviews for real estate closings.

    d.    In August of 2021, a judgment for $584,000.00 was entered in favor of Murphy (the "Murphy Judgment").

11.    After entry of Murphy's Judgment, Superior hired CBH Attorneys & Counselors to explore options to reduce or eliminate its liabilities, which included entering into good faith negotiations with Murphy to resolve Murphy's Judgment.

12.    Murphy agreed to hold off on collection efforts while the Parties negotiated resolutions.

13.    Unfortunately, Murphy's Judgment was the proverbial "straw that broke the camel's back." Murphy's Judgment rendered the company insolvent, which detrimentally impacted the company's fiscal projections and the morale of the ESOP participants.

14. Shortly after entry of Murphy's Judgment, a key employee of Superior's Connecticut office to take a job where he now competes with Superior for business. Superior's Connecticut office generated substantial net income, and the key employee was responsible for generating a significant amount of Connecticut's revenue.

15. The entry of Murphy's judgment combined with the loss of revenue from Superior's Connecticut office resulted in a ripple effect that ultimately led to Superior's CEO unexpectedly resigning from the company on December 31, 2021.

16. After the loss of its CEO, Superior's Board of Directors (the "BOD") called an emergency meeting to analyze options, including continuing operations, restructuring its debts, and/or selling its assets.

17. Due to the specialized nature of Superior's business, and its geographic footprint, the number of potential buyers or strategic partners are limited. Superior, as a result of its position in the industry, is aware of substantially all of the potential buyers.

18. The BOD proactively reached out to prospective buyers to solicit offers.

19. On January 26, 2022, Superior received a Letter of Intent (the "LOI") from AKT: Peerless Environmental Services, LLC ("AKT"). The LOI provided for payment of $250,000.00[1] in exchange for substantially all of Superior's non-cash assets.

20. However, because of the potential for unknown historical liabilities, as recently demonstrated by Murphy's lawsuit related to contracts that were executed in the mid 1990's, AKT's LOI required that the closing occur under section 363 of the United States Bankruptcy Code.

---

[1] Superior was subsequently able to negotiate an increased purchase price of $275,000.00.

21. The BOD analyzed AKT's LOI and concluded that the proposed sale to AKT of Superior's non-cash assets as a going concern followed by the orderly liquidation of its cash assets was the best option for Superior's creditors, employees, and customers.

22. A significant part of Superior's decision was based upon its cost/benefit analysis of liquidating its intangible assets and intellectual property as going concerns. After calculating the net result of continuing to operate to obtain the higher sale's proceeds rather than shutting down while liquidating its assets, Superior's BOD reasonably believed that its creditors would receive higher distributions under AKT's LOI and a section 363 sale in a Chapter 11 bankruptcy proceeding.

23. In addition to the fiscal provisions, the LOI also included ancillary provisions that Superior reasonably believed were in the best interest of Superior, Superior's Employees, Superior's Customers, Superior's creditors, and the general public. For instance, the LOI provided that:

   a. The sale would close quickly, which would minimize the stress and uncertainty for Superior, Superior's customers, and Superior's employees;

   b. AKT may, in its sole discretion, hire Superior's employees. Transitioning Superiors employees to AKT is in the best interest of Superior's employees. Transitioning Superior's employees also may result in reduced employee claims against Superior, which would increase the pro rata distributions to Superior's other creditors;

   c. AKT agreed to assume a substantial number of Superior's current projects. Specifically, AKT agreed to assume all of Superior's current projects with AT&T, the State of Michigan and any department or division thereof, and Casey's Retail

5

Company. AKT further agreed to assume, subject to approval of AKT and the customer, such other customers as AKT and Superior may mutually agree before closing. Transitioning a substantial number of Superior's current projects to AKT reduces the number of potential claims against Superior, which results in higher net distributions to Superior's other creditors.

d. The best interest of the public was protected by quickly and efficiently transferring a substantial portion of Superior's current environmental projects to AKT.

24. The proposed terms and conditions included in the LOI were formalized and finalized in an Asset Purchase Agreement (the "APA") executed by the parties on February 24, 2022.

25. In order to effectuate the section 363 sale, the BOD, after obtaining consent from the ESOP participants, issued corporate resolutions authorizing me to execute any and all documents necessary for Superior to file a Bankruptcy Petition under Chapter 11, Subchapter V, of the United States Bankruptcy Code.

## CASH COLLATERAL AND FINANCING

26. Superior is in immediate need of cash collateral as it liquidates its assets and transitions its environmental service projects.

27. Specifically, Superior needs use of the cash collateral to pay its employees, pay rent and utilities, and pay its ordinary operating costs.

28. Without access to cash collateral, Superior will be unable to maintain, repair, or insure its assets.

29. Superior's environmental consulting services fluctuate seasonally. Superior's highest revenue months are June through September. Due to weather limitations related to the

cold Michigan, Illinois, and Connecticut winters, Superior's lowest income generating months are December through March. Accordingly, Superior's financial projections demonstrate moderate losses between the Petition Date and the projected closing date for the section 363 sale.

30.  After the closing date for the section 363 sale, Superior will have minimal expenses during the liquidation of its remaining assets. It's largest expenses (employees, vendor costs for ongoing expenses, leases, etc.) will all be assumed by AKT or terminated. The primary expenses remaining during the period where Superior liquidates its remaining assets will be insurance expenses and the minimal wages necessary for the collection of the accounts receivable and administrative winddown of the company.

31.  Despite its projected net losses between the Petition Date and the closing date for the sale of its assets, Superior believes that its liquidating Chapter 11 bankruptcy will provide creditors with higher distributions than if Superior were to liquidate without operating.

32.  The higher distribution is the result of the additional proceeds generated by selling Debtor as a going concern and the resulting reduction in potential claims.

33.  AKT's offer to purchase Superior's assets includes purchasing the name, phone number, good will, and other intellectual property. A liquidation conducted outside of Chapter 11 may damage the value of Superior's intellectual property, which would negatively impact the distribution to its creditors.

34.  Furthermore, AKT's offer to purchase Superior's assets, anticipates that many of Superior's employees and customers will transition to AKT. Failure to complete an orderly transition of Superior's customers would increase the number of potential claims thereby diluting the distribution to other creditors.

35. Finally, utilizing its cash collateral will provide Superior with sufficient funds to ensure that its assets are properly maintained, repaired, and insured. Failure to properly maintain, repair, and insure its equipment, machinery, and vehicles may result in a substantial reduction in Superior's value, and therefore, reduce the overall distribution to its creditors.

## EMPLOYEES

36. Debtor currently employees eighteen (18) fulltime employees and 2 parttime employees.

37. Debtor also pays two independent contractors for services performed as needed.

38. Payroll is paid bi-weekly through Paycor payroll services. Superior's current payroll expenses are estimated at $42,000.00 every two weeks.[2]

39. The specialized nature of Superior's services limits the number of skilled employees in the labor pool.

40. Accordingly, transitioning Superior's employees to AKT with Superior's projects provides AKT with the ability to properly and timely complete the projects for the transitioned customers.

41. If Superior is unable to pay its employees between the Petition Date and the closing date with AKT, Superior's employees may obtain jobs with other environmental service providers, which may reduce the value of Superior's intangible assets.

## UTILITIES

42. Without utilities such as electricity, heat, water, and internet/telephone, Debtor cannot successfully operate its physical locations.

---

[2] Estimated bi-weekly payroll expenses based on payroll from February 25, 2022.

8

43. Indeed, any interruption of utility service to Debtor's businesses would severely disrupt and diminish Debtor's chance for a successful liquidation.

44. Any disruption of its business may result in diminished value for its intangible assets and intellectual property, which would result in reduced net distributions to creditors.

45. Accordingly, Debtor requires an order prohibiting utility providers from altering, refusing, or discontinuing services to Debtor pending resolution of any disputed adequate assurance requests.

## CONCLUSION

46. The relief sought in the First Day Motions is necessary for Debtor to operate in its Chapter 11 bankruptcy; to avoid irreparable harm to its business and the bankruptcy estate; and is in the best interests of Debtor's creditors.

**Superior Environmental Corp.**

Dated: 2/25/22

By: _____
Jeffery Skendrovic, Chief Operating Officer of Superior Environmental Corp.